## McElwee *v.* McElwee.

## (*Knoxville.* November 13, 1896.)

1. CONSTITUTIONAL LAW. *Title covers body of Act, when.*

   There is no variance between the caption and body of a statute where, under the title, "An Act to extend the statute of limitations to liens on realty and to quiet titles," it is enacted, *inter alia,* that liens retained in deeds or created by mortgages, deeds of trust, and assignments of realty to secure debts shall be barred in ten years from maturity of the debts secured. (*Post, p. 652.*)

   Constitution construed: Art. II., § 17.

   Act construed: Acts 1885, Ch. 9.

   Case cited and approved: Hyman *v.* State, 87 Tenn., 109.

2. STATUTE OF LIMITATIONS. *Renewal of notes does not extend lien.*

   Under Acts 1885, Ch. 9, a lien on realty is barred at the expiration of ten years from the maturity of the original debt secured, although the debt may have been kept alive and the time of its payment postponed by renewals of the notes within ten years next before the institution of the suit. (*Post, pp. 652, 653.*)

   Act construed: Acts 1885, Ch. 9.

3. VENDOR'S LIEN. *Barred, when.*

   A vendor's express lien for purchase money is lost when he knowingly permits a subvendee to hold and claim the land as his own under an absolute deed, for a period of seventeen years, and to make valuable improvements upon it without any successful effort to enforce his rights. (*Post, pp. 653–655.*)

4. COURT OF CHANCERY APPEALS. *Act creating is constitutional.*

   The Act creating the Court of Chancery Appeals is constitutional. The provision that the written finding of facts by that Court shall be conclusive upon this Court is not an unconstitutional limitation upon the jurisdiction of this Court,

McElwee *v.* McElwee.

nor an unconstitutional invasion of the judicial department by the Legislature. (*Post, pp. 653–661.*)

Constitution construed: Art. VI., §§ 1, 2; Art. II., § 1.

Case cited and approved: Hundhauser *v.* Insurance Co., 5 Heis., 704.

FROM M'MINN.

Appeal from Chancery Court of McMinn County. T. M. McCONNELL, Ch.

HARBISON & ROBERTS for Complainant.

BURKETT & MANSFIELD for Defendant.

WILKES, J.   This is a vendor's bill to sell a half interest in a tract of land for the purchase money.   The Chancellor refused the relief prayed, and, on appeal, the Court of Chancery Appeals has affirmed the Chancellor, and complainants have appealed to this Court.   The facts, so far as need be stated, are that complainant sold to defendant, F. B. McElwee, his brother, an undivided half interest in seven hundred acres of land in McMinn County for $4,000, in four notes—at one, two, three, and four years—for $1,000 each.   The sale was made December 17, 1879.   Deed was executed retaining an express lien for the purchase money.   On the twenty-second of April the purchaser, F. B. McElwee, sold the land, or a part of it, he owning the other half

interest in his own right, to the Mount Verd Mills Company for $16,000, to be paid in stock of the company, and the company was put in possession of the premises, and have been in possession ever since. Defendant was its secretary and treasurer. Upon the premises the company erected improvements, and spent much money, but subsequently became insolvent, and made an assignment for the benefit of its creditors.

When complainant's notes became due he renewed them from time to time, some payments being made and credited. He filed the bill in this cause February 11, 1896, to collect what he calls the balance of purchase money, evidenced by four notes—two for $900 each, one for $973, and the other for $556.37. The notes for $900 and $556.37 are dated December 15, 1894, and the one for $973 is dated November 23, 1894. The $900 notes are due in one and two years from date, and the other two are due at one day after date.

The company set up the defense that it was an innocent purchaser; that complainant's claim was stale; the statute of adverse possession of seven years; and the statute of limitation of ten years under the Act of 1885, Chapter 9; that complainant could not retain his lien upon the land for the renewal of the original notes; and that, as to the $973 note, the complainant had waived his lien by accepting collaterals as security; that the notes are really not owing, but are fraudulent.

Various errors are assigned in this Court. The first raises the question of the constitutionality of the Act of 1885, Chapter 9. It is said it is not valid because of a variance between the caption and body of the Act. The caption is, "An Act to extend the statute of limitations to liens and on realty, and to quiet titles." It may be remarked in the outset that the use of the conjunction "and" in the Act is a mere clerical or typographical error. It is insisted that the caption relates to liens on realty, and to the quieting of titles, but that the body of the Act embraces liens retained in deeds, mortgages, deeds of trust, and assignments of realty to secure debts; that the caption of the Act simply proposes to bar liens in ten years, and cannot be made to include mortgages, deeds of trust, and assignments to secure debts. It is evident that the general scope of this Act, both in its caption and body, is to provide and fix a limitation on the life of liens on real estate, no matter how created, in order to quiet titles, and is not subject to the criticism made. This constitutional provision, Art. II., Sec. 17, has, by the Court, been given liberal construction, so as not to embarrass legislation, and prevent the beneficial purposes for which it was adopted. *Hyman* v. *The State*, 3 Pick., 109–112.

It is next insisted that it is not the intent and spirit of the Act to prevent the renewal of purchase money notes, and the continuation of the original lien thereby; that the lien extends from the maturity

of the debt, and this maturity may be postponed by renewals from time to time, and the lien thus continued and its extinction deferred.  We are of opinion that the Legislature had in view, in the passage of this Act, the general registration laws, and the whole doctrine of the difference between express and implied liens rests upon this idea: that express liens, which are shown by instruments registered, are not affected by the ordinary and usual statutes of limitation, because the liens appear upon the Register's books, and are notice to the world of their existence.  If, however, the original notes may be taken up and new notes given instead, the registered instrument will convey no information of this fact. It was the evident purpose of the Act to quiet land titles and to provide that parties having or acquiring title to lands should not be disturbed by the assertion of liens more than ten years old, to enforce which no steps had been taken, and the existence of which the party holding title has no notice, and no means of acquiring any notice.  To hold otherwise would be to open the door to continual and successive renewals, and thus the lien may be extended for a series of years, and third persons could never have any assurance, from the records or otherwise, that their title would not be disturbed by secret liens.

It is assigned as error that the Court of Chancery Appeals held the mill company protected by its adverse possession of seven years.  As we un-

derstand the opinion, it is to the effect that, because of the adverse possession for seven years by the mill company, claiming the property absolutely, and the laches of the complainant in setting up his claim to a lien, he cannot now recover.

In the case of *Whitby* v. *Armour*, 4 Lea, 683, decided before the passage of the Act of 1885, it was held that the rule that the statute of limitations will not bar the vendor's express lien for purchase money, is confined, in its application, to vendor and vendee, and will not affect the intervening rights of third persons. At the time this decision was made there was no limitation applicable to such express liens, and the case presented was a sale in chancery in 1859. The decree confirming the sale retained a lien for the purchase money. Armour, the purchaser, sold off the land in 1866, 1868, and 1869, in parcels. Armour's notes matured in 1860 and 1861. A bill was filed in November, 1875, to enforce the lien for the Armour notes, alleging that they had been lost. It was held that, other questions aside, the subpurchasers, having held possession for seven years or more, had acquired good titles. It was further held that the complainants, by their laches, had lost any lien they originally had on the property. They allowed the original suit to be dismissed and acquiesced for eight years before bringing suit on the notes, and the bill was dismissed and relief denied.

In this case it appears that the mill company

had held the property under an absolute conveyance
for seventeen years before this bill was filed, all the
time claiming it as their own, improving and build-
ing upon it, all known to and acquiesced in by
complainant. It further appears that complainant in
this case filed a bill against his brother, in 1888,
to enforce a sale of this land to collect two notes
of $1,000 each, executed December 15, 1879, and
due in 1883 and 1884, and the bill avers that
these notes were executed for this land and were
the balance of purchase money on this land, and
the bill was soon after dismissed at the complain-
ant's cost. The mill company has now become in-
solvent and has made an assignment.

The Court of Chancery Appeals find, under the
facts in the record, and in view of the relationship
of complainant and defendant, who are brothers, evi-
dence of a fraudulent collusion between them to en-
able the complainant to collect his debts as purchase
money notes. It is said this question of fraudulent
collusion is not raised in the pleadings, and this is
true so far as the direct allegation is concerned,
but it is incidentally raised in setting up the laches
of complainant and the want of equity in his claim,
and can be considered in that connection.

It is next objected that the findings of the Court
of Chancery Appeals upon the question of fact in
this case are not conclusive upon this Court, and the
constitutionality of the Act creating that Court is
attacked so far as it makes that Court the final

tribunal in the determination of questions· of fact. The objection is that the latter portion of the caption of the Act establishing the Court shows that it is the purpose of the Act to limit the jurisdiction of the Supreme Court, and that Section 11 of the Act, which confers and defines the jurisdiction of that Court, provides that the finding of facts by it shall be reduced to writing and be conclusive, and the jurisdiction of the Supreme Court shall not extend thereto. The argument is, that this is a limitation and contraction of the jurisdiction of the Supreme Court, and is therefore contrary to the Constitution and Bill of Rights. It is insisted that the right of this Court to investigate the facts of all cases assigned to that Court is taken away, and that it thus invades the jurisdiction of this Court, and deprives it of power to even review the facts upon appeal from that Court, and hence it is an invasion by the Legislature upon the judiciary system of the State as fixed by the Constitution, and is contrary to Art. II., Sec. 1, of the Constitution, which divides the power of the government into three distinct departments—the legislative, executive, and judicial— and provides that no person or persons belonging to one of these departments shall exercise the powers properly belonging to either of the others, except in the cases therein directed or permitted.

Article VI., Sec. 1, of the Constitution is in these words: "The judicial power of the State shall be vested in one Supreme Court, and in such cir-

cuit, chancery, and other inferior Courts as the Legislature shall from time to time ordain and establish, in the Judges thereof, and in Justices of the Peace.'' In Section 2 it is said: ''The jurisdiction of this [the Supreme] Court shall be appellate only, under such restrictions and regulations as may, from time to time, be prescribed by law, but it may possess such other jurisdiction as is now conferred by law on the present Supreme Court.'' The Constitution of 1834 was the same as the Constitution of 1870 upon the matter of jurisdiction.

In the case of *Hundhauser* v. *Marine Fire Ins. Co.*, 5 Heis., 704, this Court said, the particular mode in which the jurisdiction (of the Supreme Court) may be exercised, whether by appeal in the nature of a writ of error or supersedeas, is a matter of regulation by the Legislature, and such restrictions and regulations may be enacted by the Legislature as may be deemed proper, so as not to defeat the ultimate control of the Supreme Court over the inferior Courts.

It is evident, upon a proper consideration of this section of the Constitution, that the jurisdiction of the Supreme Court is appellate only, and it can have and acquire no other jurisdiction.

But this appellate jurisdiction is to be under such restrictions and regulations as may, from time to time, be prescribed by the law. It is apparent, therefore, that the jurisdiction of the Supreme Court is not absolute, nor is it fixed by the Constitution,

13 P—42

except as to the requirement that it shall be appellate only.  But the Legislature may throw around this appellate jurisdiction such restrictions and regulations as it may deem wise and proper, but not so as to alter its constitutional status.  It may therefore prescribe that the Supreme Court's jurisdiction over inferior tribunals shall extend only to a review of questions of law, and not to a re-examination of questions of fact.  It follows that the Legislature may prescribe that the determination of a lower or inferior Court shall be final as to facts, and this is what is done by the Act in question.  The right of appeal to the Supreme Court is still preserved, but it extends, in such cases, only to the review of questions of law, taking the finding of facts as made by the Court of Chancery Appeals as conclusive and final.

As this is the first occasion upon which the constitutionality of this Act has been called in question, we deem it proper to enter somewhat into the history of its passage and the creation of the Court of Chancery Appeals, and the reason and occasion for its establishment.  Since the Constitution of 1870, and, indeed, before that time, the dockets of the Supreme Court had been overburdened with appeals, until it became impossible to properly dispose of them.  Various expedients were resorted to to give the relief desired, and to afford to litigants the prompt hearing which they were entitled to under the Constitution and Bill of Rights.  Intermediate

Courts have from time to time been created and vested with power more or less extensive—such as the Commission Court, the Court of Referees, the Arbitration Court—and, under the Constitution of 1870, the number of judges of this Court was temporarily increased to six, so as to enable it to sit in two sections. These were, however, at best but temporary expedients, and while the Courts thus created did much labor and accomplished a great deal toward effecting speedy trials of causes appealed, still, being only temporary and limited as to time, and to some extent as to power, they could not accomplish all that was desired, even though they may have exceeded popular expectations. But all these Courts have passed away, and live only in the history of the State's jurisprudence. The volume of litigation has not, however, decreased. There are nearly fifty inferior Courts of circuit, criminal, chancery, and special jurisdiction, from which appeals lie to this Court, besides the different County Courts in the various counties of the State, from which, in many cases, appeals lie direct to this Court. The consequence is, that the task of disposing of the causes upon the dockets of the Supreme Court was more than could be accomplished by that Court, although more than 1,200 cases per annum were disposed of. There is a limit to human capacity for work and to human endurance of toil. When that limit was reached, the question simply resolved itself into whether causes would be allowed to accu-

mulate and incumber the dockets, or some other
means be devised to hear and dispose of them. The
Act has been referred to as a measure for the re-
lief of the Supreme Court. This is a misnomer
and a misconception. The Act does not relieve the
Supreme Court or its Judges from labor; it was
not so intended, but to relieve litigants from the
delay which had become unavoidable from overcrowded
dockets.

The Supreme Court has not been relieved from
labor, but it has been aided, and the dockets have,
to some extent, been relieved by the work which
has been done already. The Court of Chancery Ap-
peals, as now provided for, is the result of the de-
liberations of a number of the wisest, ablest, and
most conservative members of the bar in the State,
and the system is in accordance with their sugges-
tions. The profession in the State has co-operated
heartily in the movement, and, under the able,
painstaking, and exceedingly energetic work done by
that Court, it has fully met the expectations of the
movers in the matter, whose only desire has been
to afford speedy trials. At no time has there been
a serious doubt as to the constitutionality of the
Court, nor as to the jurisdiction and power con-
ferred upon it, and this question was duly and prop-
erly considered by many of the ablest and most
conservative members of the profession, and received
their support, as well as the approval of the Gov-
ernor of the State, who for a long number of

years had been the Chief Justice of the Supreme Court, conversant fully with its jurisdiction and powers, as well as its needs and condition. It received, also, the support of the Bar Association of the State, out of whose deliberations and suggestions the bill was evolved, and it is a part of the history of its origin that this association most actively pressed its passage. The Court, as thus established, is a constitutional Court, and has a jurisdiction and powers which the Legislature was competent to give to it, and the constitutional powers of the Supreme Court have in no sense been invaded by the provisions of the Act constituting and establishing it and defining its powers and jurisdiction.

We see no error in the decree of the Court of Chancery Appeals, and it is affirmed.